**TRANSAMERICA INSURANCE
FINANCE CORPORATION,
Plaintiff,**

v.

**NORTH AMERICAN TRUCKING
ASSOCIATION, INC., et al.,
Defendants.**

**Civil Action No. 3:96–CV–107–H.**

United States District Court,
W.D. Kentucky.

Sept. 20, 1996.

Byron E. Leet, M. Stephen Pitt, Wyatt, Tarrant & Combs, Louisville, KY, for plaintiff.

R. Greg Hovious, Tachau, Maddox & Hovious, P.S.C., Louisville, KY, Scott P. Zoppoth, North American Trucking Association, Louisville, KY, for defendants.

## MEMORANDUM OPINION

HEYBURN, District Judge.

Plaintiff has now moved for a continuation of the preliminary injunction previously en-

tered into by agreement of the parties.[1] Because there is some relationship here between Plaintiff's claims and monetary damages, one must acknowledge that entering a preliminary injunction can only occur after the most careful consideration. Nevertheless, such a relationship is only one of numerous factors which the Court must balance and analyze. That analysis compels the Court to conclude that both a preliminary injunction and an early trial date are essential to the ends of justice in this case.

## I.

Plaintiff, TIFCO, is in the business of financing insurance premiums. Premium financing enables an insured to obtain insurance without paying the entire annual premium at the inception of the coverage. Typically, in consideration for advancement of premiums, the insured signs a premium finance agreement promising to pay the advance, plus any charges, over a term of months. The loan is typically secured by the insured's advancement of all unearned and returned premiums held by the insurance carrier that would be payable after reduction or cancellation of the policy.

Defendant, NATA, is a professional association that provides a number of trucking related services to trucking companies and independent truckers across the United States. These services are provided through NATA with the assistance of association members, affiliate members and program administrators who seek to provide, among other things, automobile liability, physical damage, and cargo insurance packages. Defendant Huff is the President of NATA and is also a licensed insurance agent in Kentucky.

In January, 1996, Huff and other NATA representatives began discussions with TIFCO for the purpose of arranging premium financing from TIFCO for a physical damage master insurance policy that Britamco would issue to NATA. The parties had these discussions at a number of times and places which are not in dispute. The exact content of the discussions, however, is hotly disputed. What can be said with some certainty is that

on or about January 15, 1996, Britamco issued a physical damage master insurance policy for NATA (the "Policy") with coverage to commence on the same day. The Policy calculates the lump sum premium, which assumes full exposure at $6.8 million. Britamco expected the lump sum payment of $5 million from NATA within one week of the binding coverage. At the same time Britamco authorized NATA to collect premiums on behalf of Britamco.

Thereafter, TIFCO agreed to provide financing for the entire project, although the parties vigorously dispute the precise nature of the oral discussions and agreements resulting from those discussions. What is certain is that on January 16, 1996, Huff signed the standard two-page $5.4 million premium finance agreement (the "Agreement") on behalf of NATA. On January 17, 1996, TIFCO approved the Agreement and on the following day forwarded to Huff a check in the amount of $5,465,530.30, payable to NATA.

TIFCO says that it expected NATA to use the $5.4 million check to pay Britamco for the premium due. Britamco says that it expected to receive $5 million as a lump sum premium for the Policy. Between January 17 and February 5, both Britamco and TIFCO checked several times to determine whether NATA would be paying the lump sum premium. By February 5, 1996, other than $300,000 that had "trickled in," NATA still had not remitted payment to Britamco. About the same time NATA and Britamco discussed changing the exact terms of the insurance coverage and the premium payments schedule. As a consequence, on February 5, Britamco canceled the Policy because it no longer represented the insurance arrangements between the parties.

After Britamco canceled the Policy, TIFCO became concerned about the integrity of its deal with NATA. Moreover, it believed that NATA had violated an implied condition of the Agreement by not paying the lump sum directly over to Britamco. Therefore, TIFCO rescinded the Agreement and demanded repayment of the entire $5.4 million. When NATA refused, TIFCO filed this com-

---

1. The Court does attach any significance to the       prior agreed injunction.

plaint to obtain return of all the funds which it advanced under the Agreement. TIFCO is now seeking to enjoin NATA from any further use of the funds inconsistent with that Agreement.

Although the parties may agree on this skeletal recitation of the events which occurred during that month, they agree on little else. Defendants contend that the Agreement was not the real agreement among the parties and that TIFCO fraudulently induced Defendants into executing it. Huff says that he did not read the Agreement and that he was informed prior to signing it that it was of no consequence and did not reflect the actual agreement of the parties. Defendants contend that the real agreement is one which the parties reached orally. That agreement, they say, gives TIFCO no security in consideration for providing the financing and places no limitation on Defendants' use of the loan proceeds. In its amended counterclaim, Defendants allege breach of contract as to both the oral agreement and the written "dummy" contract; fraud, deceit and misrepresentation; breach of implied duty of good faith and fair dealing; breach of fiduciary duty; intentional interference with contractual relations; intentional interference with performance of the contract; defamation; abuse of process as well as violation of various Kentucky insurance statutes and regulations.

TIFCO, on the other hand, says that because the Agreement is unambiguous and is a valid and enforceable contract, it will undoubtedly succeed on its breach of contract claim against NATA. In addition, TIFCO says that without the ability to enjoin NATA's further dissipation of their allegedly fraudulently obtained funds, it will suffer irreparable injury.

## II.

■ In determining whether to issue a preliminary injunction, the Court must balance four factors: (1) the likelihood of the movant's success on the merits; (2) whether the injunction will save movant from irreparable injury; (3) whether the injunction would harm others; and (4) whether the public interest would be harmed or served by the injunction. *In re DeLorean Motor Co.,* 755 F.2d 1223, 1228 (6th Cir.1985). The Court has considerable discretion and these factors are meant to be a guide rather than a rigid or unbending formula. *In re Eagle–Picher Indus., Inc.,* 963 F.2d 855, 859–60 (6th Cir.1992).

### A.

■ The Court must consider first whether TIFCO is likely to prevail on its breach of contract claim. The Court has reviewed the Agreement and finds it clear and unambiguous. As premium finance agreements go, there appears to be nothing unusual about this one. TIFCO provided $5.4 million to pay premiums for the Policy.[2] In exchange for receiving the premium financing, NATA promised to repay the amount, plus finance charges, in ten (10) equal monthly installments of $566,693.03, due the 15th day of each month beginning February 15, 1996. As security for repayment of the loan, NATA assigned to TIFCO all unearned and return premiums that would become payable by Britamco upon reduction or cancellation of the insurance coverage. Further, NATA warranted the existence of the Policy.

■ Defendants' argument that Huff, the signator, did not read the Agreement is without merit. Huff was completely familiar with these kinds of agreements. Generally, a person signing an agreement with the capacity and opportunity to read it before doing so is presumed to know the contents. Those are precisely the circumstances here. The terms of the Agreement and the remedies under it appear to be equally clear. Unquestionably, it binds NATA.

In order to establish breach of the Agreement, TIFCO must clearly demonstrate that it is entitled to return of the loan proceeds. The Agreement creates security for TIFCO

---

**2.** One part of the Agreement states that TIFCO would be making the premium payments to Britamco; another part of the Agreement states that TIFCO's premium financing either would be "provided to you [NATA] or on your behalf [to Britamco]." In fact, TIFCO provided the financing directly to NATA.

based upon the presumption that NATA would remit the premium financing to Britamco. Because NATA did not make this payment, it failed in an essential part of the Agreement. In doing so, NATA destroyed TIFCO's collateral in the unearned and return premiums, which would have been payable by Britamco upon reduction or cancellation of the Policy.

Moreover, TIFCO's absolute entitlement to these funds rests upon another even stronger ground. Under the Agreement, when Britamco rescinded the Policy, the unpaid balance of the financed premium became "immediately due and payable." Since NATA misappropriated the loan, it could not make such an immediate payment to TIFCO.[3] There is no doubt that NATA's conduct constituted a total and complete breach of the Agreement and that TIFCO has suffered substantial damage. On these facts, the Court finds that TIFCO is likely to succeed on the merits of its breach of contract claim.[4]

### B.

■■■ The second factor the Court must consider is whether TIFCO will suffer irreparable harm in absence of a preliminary injunction. Defendants claim that TIFCO will not suffer irreparable harm because it can be adequately compensated by money damages. As a general rule, where the harm suffered by the moving party may be compensated by an award of money damages at judgment, courts will refuse to find the harm irreparable. *See DeBeers Consol. Mines Ltd. v. United States,* 325 U.S. 212, 219–220, 65 S.Ct. 1130, 1133–1134, 89 L.Ed. 1566 (1945). Nevertheless, the power of a district court to

exercise its equitable powers in ordering a preliminary injunction to secure an equitable remedy such as restitution is well established. In *DeBeers,* the Supreme Court held that a preliminary injunction is always appropriate to grant intermediate relief of the same character as that which may be granted finally. *Id.* at 220, 65 S.Ct. at 1134.

In such cases, courts have found irreparable harm where the facts show that the final equitable relief may be uncollectible. For example, in *USACO Coal Co. v. Carbomin Energy, Inc.,* 689 F.2d 94, 97 (6th Cir.1982), the Sixth Circuit found the risk that the defendant would transfer or dissipate the assets constitutes irreparable harm and justified a preliminary injunction to preserve the equitable remedy. *See also Reebok Intern'l, Ltd. v. Marnatech Enterprises, Inc.,* 970 F.2d 552, 559 (9th Cir.1992) ("A court has the power to issue a preliminary injunction in order to prevent a defendant from dissipating assets in order to preserve the possibility of equitable remedies.") (quoting *Republic of the Philippines v. Marcos,* 862 F.2d 1355, 1364 (9th Cir.1988)); *F.T.C. v. H.N. Singer, Inc.,* 668 F.2d 1107, 1112–13 (9th Cir.1982) (finding the district court had the power to issue a preliminary injunction to preserve the status quo in order to protect the possible equitable remedy of recession of a contract and restitution of money obtained by fraud).

The Sixth Circuit has not directly addressed the issue of whether injunctions are appropriate to protect a potential damages remedy. However, many other courts have found irreparable harm to exist where the remedy at law would be inadequate.[5] To the

---

**3.** Admittedly, TIFCO acted quickly. However, its actions cannot be reviewed as premature either based on what TIFCO knew then or on what it knows now. NATA could not give adequate assurance that it could make "immediate" repayment. According to NATA's own records, within days of receipt from TIFCO, NATA used the loan proceeds to pay its own creditors and those of its affiliate companies. Fifty Thousand Dollars ($50,000) went to Huff himself.

**4.** It is not essential that the Court consider whether TIFCO will be successful in its own fraud claim, its breach of fiduciary duty claim against Huff or in defense of Defendants' fraudu-

lent inducement counterclaim. *See H.C. Hanson v. American Nat. Bank & Trust Co.,* 844 S.W.2d 408, 412 (Ky.1992), (holding that since the defendant was forced to affirm the contract in order to sustain its fraudulent inducement claim, the trial court properly directed the verdict on the contract for the lender). However, this Court would not enter an injunction if it believed NATA would ultimately prevail on its claims. The Court does not think this will occur.

**5.** The requirement that there be "no adequate remedy at law" does not mean that the plaintiff must show that an award of damages at trial would be wholly ineffectual; it is sufficient if

extent our case concerns purely legal remedies, those cases are instructive. For example, in *Deckert v. Independence Shares Corp.*, 311 U.S. 282, 290, 61 S.Ct. 229, 234, 85 L.Ed. 189 (1940), the Supreme Court held that a preliminary injunction designed to freeze the status quo and protect a damages remedy is an appropriate form of relief when it is shown that the defendant is likely to be insolvent at the time of judgment. Similarly, the Seventh Circuit has found that even where a harm could be remedied by legal damages at judgment, irreparable injury may still exist where the moving party's business cannot survive absent a preliminary injunction or where the defendant may become insolvent before a final judgment can be entered and collected. *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir.1984). *See also Teradyne, Inc. v. Mostek Corp.*, 797 F.2d 43, 53 (1st Cir.1986) (finding irreparable harm where assets were being used to pay off creditors' claims and wind down expenses in what defendant described as an "orderly liquidation process"); *American Hospital Supply v. Hospital Products Ltd.*, 780 F.2d 589, 596 (7th Cir. 1986) ("[A] defendant's insolvency is a standard ground for concluding that a plaintiff's harm if a preliminary injunction is denied will not be cured by an award of damages at the end of trial."); *Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 206 (3rd Cir. 1990) (concluding the possibility of an unsatisfied money judgment can constitute irreparable injury for purposes of granting preliminary injunctive relief); *In re Feit & Drexler, Inc.*, 760 F.2d 406, 416 (2d Cir.1985) ("[E]ven where the ultimate relief sought is money damages, federal courts have found preliminary injunctions appropriate where it has been shown that the defendant 'intended to frustrate any judgment on the merits' by

'transfer[ring] its assets out of the jurisdiction.' " (quoting *Productos Carnic, S.A. v. Central American Beef and Seafood Trading Co.*, 621 F.2d 683, 686 (5th Cir.1980)).

For the most part, these situations seem to be quite narrow, reflecting instances where the harm to the plaintiff from denying the injunction is especially high. Furthermore, the preliminary injunctions issued are usually "carefully tailored, generally operating simply to secure the plaintiff's opportunity to receive an award of money damages at judgment." *Hughes Network Systems, Inc. v. Interdigital Communications Corp.*, 17 F.3d 691, 694 (4th Cir.1993).

While none of these cases are binding on our facts, they are helpful in establishing the broad contours of the Court's discretion. Every court struggles to reconcile the conflicting factors measuring the fairness of preliminary injunctive relief in particular circumstances.

The Court now turns to the question of whether TIFCO would suffer irreparable injury under the particular circumstances of this case absent preliminary injunctive relief. First, the relief which TIFCO seeks has its genesis in equity. The Court need not create the fiction of equity from whole cloth. TIFCO seeks rescission of the contract and restitution of the funds advanced based on NATA's material and fundamental breaches of the Agreement and fraudulent misappropriation of the funds.[6] Because TIFCO seeks rescission of a contract tainted by fraud and restitution, it is entitled to preliminary relief designed to protect possible equitable remedies. The fact that the relief operates upon money, in these circumstances, is immaterial because TIFCO is seeking restitution of funds advanced rather than purely legal damages.

---

damages will for some reason be seriously deficient as a remedy for the harm suffered. *Roland Mach. Co. v. Dresser Indus.*, 749 F.2d 380, 386 (7th Cir.1984).

6. TIFCO properly invoked the Court's equitable jurisdiction on their breach of contract claim through their request for relief of recession of the contract and restitution of the loan proceeds. Restitution is available to a non-breaching party when the other party is in total breach or has repudiated the contract. Restatement (Second)

of Contracts § 373, at 208 (1981). In order for an injured party to maintain an action for restitution in a breach of contract case, the defendant's breach must be "so material that it is held to go to the 'essence'; it must be such a breach as would discharge the injured party from any further contractual duty on his own part." Corbin on Contracts § 1104, at 56 (1964). The Court finds that the NATA's breach in this case was clearly material and total.

To be sure, there are many factual distinctions between our case and *USACO*. However, the Court finds it fundamentally supportive of the result here. In *USACO*, as here, the movants clearly sought equitable relief. Similarly, the Court here seeks not to preserve Defendant's assets pending a final determination of rights, but rather to secure TIFCO's equitable remedies. *USACO*, 689 F.2d at 98.

Second, even if one characterizes TIFCO's potential remedies as legal rather than equitable, the Court finds that Plaintiff has no adequate remedies at law and will suffer irreparable harm in the absence of a preliminary injunction. There is no dispute that immediately upon the January 18, 1996, deposit of the $5.4 million advance into NATA's account, major cash disbursements were made from the account representing approximately $4.97 million of the advance. The Court has heard from NATA itself that it is suffering severe financial difficulties and may be on the verge of bankruptcy. Absent preliminary injunctive relief restraining the transfer of the remainder of the loan in the hands, or under Defendants' control, there is little doubt that the remainder of the loan proceeds will quickly disappear, and there is little hope that any of the proceeds will be available to TIFCO at final judgment. The Court finds both the threat of bankruptcy and the threat of further fraudulent dissipation of the remainder of the loan proceeds constitute irreparable harm to TIFCO.

### C.

The final factors the Court must consider are whether the injunction would harm others, in particular NATA, and whether the public interest will be served by the preliminary injunction. As the Court sees it, the harm to NATA stems only from its inability to further improperly deplete the loan proceeds. Certainly, it would not be in the public interest to allow NATA to further misappropriate the funds. Another critical factor is that the relief requested by TIFCO is narrowly tailored. It only seeks to restrain NATA from using the remainder of identifiable funds, not NATA's assets in general. Indeed, the relief concerns only a small part of the loss which TIFCO anticipates from the transaction.

■ The Court cannot overlook the possibility that no matter how well reasoned its preliminary injunction, nevertheless it could cause Defendants a serious injustice. If the Court is wrong, the opportunity for Defendants to redress the wrong in court may be delayed too long to undue the damage. Moreover, there is always the danger of creating two separate litigation tracts, which may be unbearable for financially strapped NATA. An immediate trial date could cure these potential harms. The Court has carefully reviewed the basic allegations of the complaint and counterclaims; it has discussed the proof necessary to try this case to a jury. The Court concludes that the case can be ready for trial within one month. Under these circumstances, the early trial date alleviates any remaining concern that this injunction causes an injustice. *See Hughes Network Systems*, 17 F.3d at 696 (finding where a preliminary injunction may cause serious harm to a party, the district court may also weigh the prospect for a prompt final judgment in determining the need for preliminary relief). In fact, the immediate trial does something more positive: it creates the opportunity to swiftly and efficiently conclude a dispute which needs resolution now.

The Court finds after weighing the four factors a district court must consider in determining whether to issue a preliminary injunction that the Plaintiffs are entitled to preliminary injunctive relief.

### ORDER

The Court having considered Plaintiffs application for continuation of the preliminary injunction, having issued a Memorandum Opinion and being otherwise sufficiently advised,

IT IS HEREBY ORDERED that Plaintiff's motion is SUSTAINED and the preliminary injunction is continued.

IT IS FURTHER ORDERED that on or before September 24, 1996, Plaintiff shall post a bond in the amount of $250,000.

IT IS FURTHER ORDERED that a jury trial shall commence on **October 9, 1996,** as

to all issues in this case. The Court will establish a tentative trial schedule prior to commencement of the trial.

IT IS FURTHER ORDERED that this case is referred to Magistrate Judge James D. Moyer for all further scheduling and discovery orders. Magistrate Moyer will convene an immediate discovery conference and shall be authorized to discuss a precise schedule from October 9 forward in order to accommodate ongoing-discovery. All discovery disputes shall be brought to Magistrate Moyer's immediate attention for resolution without written briefs. Any failure of counsel to cooperate in discovery or to fully extend the resources of their respective firms in order to meet the trial and discovery requirements, may result in release of the injunction or maintenance of it and cancellation of the trial date.