**E.I. DU PONT de NEMOURS AND COMPANY, a Delaware corporation, Plaintiff,**

v.

**HEM RESEARCH, INC., a Maryland corporation, Defendant.**

**Civ. A. No. 10747.**

Court of Chancery of Delaware, New Castle County.

Submitted: Oct. 31, 1989.
Decided: Nov. 6, 1989.

William H. Sudell, Jr., Jack B. Blumenfeld, Matthew B. Lehr, and R. Judson Scaggs, Jr., of Morris, Nichols, Arsht & Tunnell, Wilmington, for E.I. duPont de Nemours and Co.

Lawrence C. Ashby, Steven J. Balick, and Keith R. Sattesahn, of Ashby, McKel-vie & Geddes, Wilmington, and Michael Arthur Walsh, of Choate, Hall & Stewart, Boston, Mass., for HEM Research, Inc.

## OPINION

JACOBS, Vice Chancellor.

The plaintiff, E.I. duPont de Nemours and Company, a Delaware corporation ("DuPont") has moved for a preliminary injunction restraining the defendant, HEM Research, Inc., a Maryland corporation ("HEM"), from paying a dividend, making other distributions, or otherwise dissipating its assets other than in the ordinary course of its business. This is the decision of the Court on that motion.

### I.

In this action, DuPont seeks to undo its shareholder and contractual relationship with HEM. HEM is a research corporation that owns certain rights with respect to Ampligen, which is a pharmaceutical compound being tested and developed for possible treatment of human immunodeficiency virus ("HIV"). In its amended complaint, DuPont alleges that HEM misrepresented the efficacy of Ampligen and thereby induced DuPont to execute a series of agreements with HEM relating to the research and commercial development of Ampligen. DuPont claims that it was also induced to invest over $30 million in HEM and Ampligen, of which $21 million was paid to HEM.

In this action DuPont seeks two forms of relief: (a) rescission of its agreements with HEM, including a money judgment to recover over $30 million in rescissory damages, and (b) an injunction preventing HEM from dissipating its assets other than in the ordinary course of business pending the determination of its rescission claim. DuPont contends that without an injunction it will suffer irreparable harm because (i) HEM's net worth is presently insufficient to satisfy a possible money judgment in favor of DuPont, and (ii) HEM intends to declare a dividend and make other payments that would further frustrate its ability to collect such a judgment.

In response to the amended complaint, HEM moved to dismiss this action in its entirety for lack of subject matter jurisdiction and for failure to state a claim upon which relief may be granted. In a Memorandum Opinion dated October 13, 1989, Chancellor Allen granted HEM's motion as to the rescission claim on jurisdictional grounds. The Court held that DuPont was really seeking money damages for which rescission at law was an adequate legal remedy; however, the Chancellor reserved decision on the question of whether equitable jurisdiction had been conferred by virtue of DuPont's request for interim injunctive relief. That issue had not been fully briefed and its determination would await the instant motion. *E.I. duPont de Nemours v. HEM Research, Inc.,* Del.Ch., C.A. No. 10747, Allen, C., 1989 WL 122053 (October 13, 1989).

Thereafter, the parties engaged in discovery and filed briefs and affidavits on an expedited schedule. Oral argument on DuPont's injunction motion took place on October 31, 1989.

## II.

To obtain preliminary injunctive relief, the plaintiff must demonstrate that (a) it has a reasonable likelihood of success on the merits, (b) the failure to grant preliminary injunctive relief will cause it irreparable injury, and (c) the threatened injury to the plaintiff if relief is denied outweighs the threatened injury to the defendant if relief is granted. *Ivanhoe Partners v. Newmont Mining Corp.,* Del.Supr., 535 A.2d 1334, 1341 (1987); *Shields v. Shields,* Del.Ch., 498 A.2d 161, 166 (1985).

In an effort to establish probable success on the merits, DuPont presented evidence designed to show that HEM had misrepresented the virtues of Ampligen, thereby inducing DuPont to enter into agreements with, and invest substantial monies in, HEM. Those incorrect statements are claimed to have been made in a draft article supplied by HEM to DuPont, which was later published in *Lancet,* a British medical journal, in June, 1987. The *Lancet* article discussed the efficacy and safety of Ampli-

gen based upon an ongoing clinical study involving 10 patients infected with HIV. That article reported that the Ampligen treatment had had dramatic virological, immunological, and clinical effects on those patients, and it represented that Ampligen had a "profound and uniformly suppressive effect on HIV expression."

DuPont contends that these representations about Ampligen's efficacy did not accurately reflect the underlying clinical study data upon which the *Lancet* article was based, specifically, data derived from "co-culture" and "T4 Cell" testing. In fact, DuPont argues, that data demonstrated that the Ampligen treatment had no consistent effect upon the virus. It is undisputed that HEM formally warranted the truth of its representations made to DuPont in the *Lancet* article. DuPont contends that because those representations were inaccurate and were material inducements for it to enter into the various agreements with HEM, and to invest substantial funds in HEM and Ampligen, DuPont is entitled to rescission (including money damages).

HEM ardently disputes these contentions. It maintains that the representations in the *Lancet* article were factually correct and properly supported by the underlying data and that any errors in that article were minor and immaterial. Moreover, HEM argues, the *Lancet* article was but one part of a much larger body of Ampligen-related data that HEM supplied to DuPont and that DuPont does not dispute.

This thumbnail sketch of the parties' factual positions does not, nor is it intended to, do justice to their detailed, elaborate, written and oral presentations on these questions. These conflicting "facts" involve intricate scientific laboratory data, and questions concerning the appropriate method for its evaluation, in a highly complex and specialized area. The parties' presentations on these questions, supported by affidavits of respected medical and academic professionals from prestigious institutions, consumed the great bulk of the briefs submitted by both sides. But given the nar-

row jurisdictional ground for this Court's ruling, those scientific issues, though ably presented and clearly pertinent to the merits of the rescission claim, do not bear upon the question found here to be dispositive. Accordingly, the Court does not (because it need not) pronounce upon the probable merits of the parties' factual claims concerning the accuracy of the *Lancet* article.

The facts relating to the payments that DuPont seeks to have enjoined are, however, pertinent. Those proposed payments, which total $1,154,000, are part of an earlier business transaction in which HEM settled certain litigation against it, and a new investor group acquired control of the company. As part of that transaction, HEM received over $1.45 million from the new investors and became obligated to make certain payments. Those payments include a dividend to HEM stockholders (including DuPont), and the reimbursement of a key HEM employee's legal fees and lost compensation, of HEM's former management's severance benefits, and of the new investors' legal fees.

On may 8, 1989, DuPont and HEM entered into an agreement pursuant to which HEM would refrain from making those payments for 180 days or until DuPont's injunction claim was resolved, whichever came first. Because that 180 day period would expire on November 5, 1989, DuPont brought on the pending motion to enjoin the making of those payments and other distributions not in the ordinary course of business, *pendente lite*.[1]

### III.

DuPont couches its argument in support of preliminary injunctive relief in traditional terms. To be precise, DuPont argues that it has established probable success on the merits of its claim for over $30 million in damages. It further argues that because HEM may or will dissipate what assets it has before DuPont can collect its damages, DuPont will suffer irreparable harm unless interim injunctive relief is

awarded. That harm is said to consist of DuPont's inability to obtain satisfaction of any eventual judgment for rescissory damages.

■ Despite the attractive simplicity of DuPont's position, it is manifest under established principles of Delaware law, that this Court does not have the power to grant the relief requested. As early as 1922, the Chancellor so declared in *Cities Service Co. v. McDowell*, Del.Ch., 116 A. 4 (1922); *accord, Skinner v. Educational Pictures Securities Corporation*, Del.Ch., 129 A. 857, 859 (1925). With regard to when injunctive relief may be had, the Court in *Cities Service* stated:

> Injunctive relief may be granted on various grounds. In a general way, it may be said that two classes of cases call for its application: First, where, for instance, irreparable injury is threatened, or some forbidden act is about to be done by corporate or municipal officers, in cases of which kind the preventive aid of equity is the ultimate relief sought; and second, where the injunction is sought not as the ultimate and only relief, but in aid of some primary equity which the bill sets up.

116 A. at 9.

This case does not fall within either enumerated category. First, while the amended complaint does pray (*inter alia*) for a final injunction of the same character as the preliminary injunction being sought here, any such relief would be "final" only in form. Neither in reality nor in substance would it be "the ultimate relief sought" in this action (116 A. at 9), and DuPont does not contend otherwise. No claim is made here that the proposed transfer of HEM's funds is independently wrongful. In reality the ultimate relief that DuPont seeks—and its true objective—is to obtain a money judgment for rescissory damages, relief that this Court has already determined to be available at law. Therefore, any injunction entered in this action (even if it were labeled "final")

---

1. At the oral argument HEM agreed to postpone the payments for an additional week to afford the Court sufficient time to decide this motion.

would necessarily be preliminary. That is because its sole function and effect would be to freeze HEM's assets in place to make them available to satisfy any money judgment that DuPont would obtain if it were to prevail on its rescission claim. To say it in different words, rescissory damages, not injunctive relief, is the raison d'etre for this equitable action.

■ Second, this is not a case where injunctive relief is sought "in aid of some primary equity which the bill sets up," *i.e.*, in aid of a claim that would serve independently as a basis for equitable jurisdiction. *Id.* A court of equity has the power to grant ancillary injunctive relief to protect its jurisdiction over (and the parties entitlement to a meaningful adjudication of their rights in) the property or other matter that is the subject of the action. Two cases relied upon by DuPont, *Eberhardt v. Christiana Window Glass Co.*, Del.Ch., 74 A. 33 (1909) and *Brinati v. Telestar*, Del. Ch., C.A. No. 8118, Berger, V.C. (September 3, 1985), exemplify the proper use of that ancillary injunctive power.

In *Eberhardt*, this Court enjoined the defendants from transferring a mortgage note, title to which was in issue in the action. In *Brinati*, the plaintiff sought to enforce a right under a shareholders' agreement to have the corporation dissolved and liquidated if certain events did not occur by a specific date. Finding that the corporation should be dissolved under that agreement, this Court issued a preliminary injunction preventing (with exceptions not relevant here) any further expenditures of corporate funds or assets other than for purposes of liquidating and winding up the corporation's affairs. Thus, in both *Eberhardt* and *Brinati*, ancillary injunctive relief was granted to protect the Court's jurisdiction and control over the specific assets that would necessarily be the subject of any final judgment.

Here, in contrast, the complaint sets up "no equity whatsoever" in the property that is the subject of the requested injunction. *Cities Service Co. v. McDowell*, 116 A. at 9. No lien, trust, or other property right is sought to be created in the specific HEM dollars whose expenditure the plaintiff seeks to restrain. No claim of entitlement to those specific dollars is asserted. The only possible interest that DuPont has in those monies is this: if DuPont were to obtain a money judgment against HEM, it might resort to those funds in satisfaction, so far as possible, of the amount found to be owed by HEM, their owner.

Our case law clearly holds that absent statutory authorization,[2] the injunctive powers of this Court cannot be used for that purpose. *Cities Service Co. v. McDowell*, 116 A. at 9; *Skinner v. Educational Pictures Securities Corporation*, 129 A. at 859. If the law were otherwise:

> ... then the injunction in equity would be used similarly to and as broadly as the mesne process of attachment at law. At least in substance it would be so. The writ of injunction cannot be used in this manner. Its issuance must be predicated on the existence of some equity. *The anticipatory desire to aid the enforcement of a possible future decree, standing alone, has never been recognized as constituting such an equity.*

*Cities Service*, 116 A. at 9 (emphasis added).

The Supreme Court of the United States employed similar reasoning in *De Beers Consol. Mines v. United States*, 325 U.S. 212, 65 S.Ct. 1130, 89 L.Ed. 1566 (1945).

---

**2.** No such statutory authorization is claimed or exists here. In some jurisdictions, the court is authorized by statute to attach the defendant's property to preserve assets that might satisfy a possible judgment. *See* 6 Am.Jur.2d, *Attachment and Garnishment*, § 55 (1963). That is not the law in Delaware. 10 *Del.C.* § 3507 authorizes prejudgment attachment of the property of a foreign corporation, but this Court is not authorized to issue an attachment, which is a remedy at law; moreover, prejudgment attach-ment is granted to compel the nonresident defendant's appearance. *Blaustein v. Standard Oil Co.*, Del.Supr., 56 A.2d 772 (1947). This Court is authorized by statute to sequester a nonresident defendant's property within the State (10 *Del.C.* § 366), but, as with attachment, that is normally done only to compel the defendant's appearance. Because HEM has appeared, sequestration is unnecessary and, in any event, DuPont has not sought to invoke that procedure.

There the Supreme Court vacated an injunction in an antitrust case, restraining a foreign corporate defendant from transferring or disposing of any of its assets located in the United States pending the ultimate determination of the Government's antitrust claims. The Court noted that the requested preliminary injunction was not one that could have been granted finally, because it had no relationship to issues or property that were the subject of the lawsuit; nor could the injunction be justified on the basis that it was needed to protect the Court's jurisdiction. Therefore, the Supreme Court concluded:

> This process is, and can only be, sustained as a method of providing security for compliance with other process which conceivably may be issued for satisfaction of a money judgment for contempt....
>
> Federal and State courts appear consistently to have refused relief of the nature here sought.

325 U.S. at 220–221, 65 S.Ct. at 1134–35 (footnote omitted).

That Court went on to say that:

> To sustain the challenged order would create a precedent of sweeping effect. This suit, as we have said, is not to be distinguished from any other suit in equity. What applies to it applies to all such. Every suitor who resorts to chancery for any sort of relief by injunction may, on a mere statement of belief that the defendant can easily make away with or transport his money or goods, impose an injunction on him, indefinite in duration, disabling him to use so much of his funds or property as the court deems necessary for security or compliance with its possible decree. And, if so, it is difficult to see why a plaintiff in any action for a personal judgment in tort or contract may not, also, apply to the chancellor for a so-called injunction sequestrating his opponent's assets pending recovery and satisfaction of a judgment in such a law action. No relief of this character has

been thought justified in the long history of equity jurisprudence.

325 U.S. at 222–23, 65 S.Ct. at 1135.

Those observations and concerns apply with equal force in this case.

### IV.

DuPont does not frontally challenge these principles. Rather, it attempts to sidestep them by contending that they do not operate to bar injunctive relief in these particular circumstances. DuPont concedes that an interim injunction is not available merely to aid the enforcement of a possible future judgment; it denies, however, that it is seeking relief for that purpose. Relying upon *Bayard v. Martin,* Del.Supr., 101 A.2d 329 (1953), *cert. denied,* 347 U.S. 944, 74 S.Ct. 639, 98 L.Ed. 1092 (1954) and certain federal decisions, DuPont argues that where a plaintiff can show that (i) it would be irreparably harmed due to its inability to be made whole by a money judgment, and (ii) the defendant has threatened to dissipate its assets *pendente lite,* a preliminary injunction may issue.

That argument is factually unsupported and legally unsound. Insofar as the argument rests upon HEM's insolvency, factually it does not fit this case. HEM is not presently insolvent, and the proposed dividend and other payments will not render it insolvent.[3] The only threat to HEM's solvency is future and contingent; that is, HEM would be made insolvent only if and when DuPont prevails in its rescission action at law and is awarded a money judgment exceeding HEM's net worth. DuPont cites no authority holding that the mere assertion of an unliquidated claim at law in an amount exceeding a defendant's net worth, without more, warrants a grant of injunctive relief "freezing" that defendant's assets *pendente lite.*

A more fundamental difficulty with DuPont's position is that it is legally unsound. In essence, DuPont argues that even though it does not seek to create an "equi-

**3.** HEM's net worth as of December 31, 1988, was $8,552,000. The amount of the proposed dividend and other payments is $1,154,000.

ty" in the specific monies whose disposition it would have restrained, the circumstances here establish an independent basis of equitable jurisdiction upon which interim injunctive relief can be predicated. It contends that the following dictum in *Bayard v. Martin*, 101 A.2d at 334–335, supports the view that a defendant's insolvency (present or future), coupled with the threatened dissipation of some of the defendant's assets, independently supports a grant of interim injunctive relief:

> Plaintiffs next urge that, without the help of the Court of Chancery, they may lose $20,000 or $25,000, that sum being the approximate total of all the installments which have matured up to the present. They ask us to decide that if they should now pay these installments to Martin, they will never recover the money, even if they should ultimately get a judgment against him for its recovery. Properly supported, this could also be a powerful argument. *While it is axiomatic that courts of equity will not deal in matters readily measurable in dollars, one of the recognized exceptions to that rule is where it appears that a money judgment would not produce the dollars.* Thus, courts of equity often intervene in cases of insolvency and non-residence.

(emphasis added).

 DuPont misconceives both the holding of *Bayard v. Martin* and the relevance of insolvency to equitable jurisdiction. Insolvency is not a circumstance that independently confers jurisdiction upon a court of equity. Rather, insolvency establishes the defendant's inability to respond to a judgment, and, therefore, negates the adequacy of the legal remedy. *See Heilman v. Union Canal Co.*, 37 Pa. 100, 104 (1860). Thus, while it is correct that "courts of equity often intervene in cases of insolvency," (*Bayard v. Martin, supra*), they do so only where there exists an independent jurisdictional basis, apart from the insolvency itself, for equity to intervene.

*Bayard v. Martin* does not depart from that principle. There the plaintiffs (Bayard) sought a preliminary injunction to prevent the defendant (Martin) from proceeding with executing upon certain judgment notes, pending the outcome of related litigation in the Superior Court. In the Superior Court litigation the plaintiffs (Bayard) were contending, by way of counterclaim, that fraud had been committed in the underlying transaction pursuant to which Martin received the judgment notes. The plaintiffs (counterclaimants in the Superior Court) sought injunctive relief in Chancery to protect themselves from being compelled to pay to the defendant (Martin) the entire amount of those judgments until the plaintiffs' Superior Court fraud counterclaim was first resolved. Otherwise, the plaintiffs argued, they would be irreparably harmed because the defendant (Martin) was insolvent, and if he were allowed to collect those judgments before the counterclaim was determined, the plaintiffs would never recoup what they had been ordered to pay to him. The Supreme Court upheld the denial of injunctive relief on the ground (*inter alia*) that the plaintiffs had not established factually either that Martin was insolvent or that they would otherwise be irreparably injured if injunctive relief were denied.

Two observations about *Bayard v. Martin* are central. First, that case did not involve an application for interim injunctive relief by a plaintiff-creditor seeking to hold the defendant debtor's assets in place to make them available for satisfaction of a possible damage judgment. There the plaintiffs were seeking to prevent the defendant from collecting the full amount of his judgment against them, on grounds of equitable set-off. Thus, the issue posed here was not presented in *Bayard v. Martin.*

Second, *Bayard v. Martin* does not, either explicitly or *sub silentio*, overrule or limit the principles articulated in *Cities Service* and *Skinner, supra;* indeed, *Bayard v. Martin* is consistent with those principles. In *Bayard*, the preliminary injunctive relief requested was of the same character that the court was asked to grant finally. Moreover, the court was independently empowered to grant such relief un-

der its equitable power to order a judgment creditor to set-off against his claim, an independent claim of the judgment debtor that otherwise would be uncollectible because of the judgment creditor's insolvency, nonresidence, or for some other sufficient reason. 49 C.J.S. *Judgments* § 370(a) (1947). Far from breaking new jurisdictional ground, *Bayard v. Martin* simply applied traditional principles to the facts before it.[4]

## V.

Because this Court lacks the power to grant the kind of preliminary injunctive relief sought here, DuPont has failed to establish a probability of success on the merits of its claim. Accordingly, DuPont's motion for a preliminary injunction must be denied. IT IS SO ORDERED.

4. Nor do the federal decisions cited by DuPont in a post-argument letter memorandum, persuasively support its legal position. Those decisions are factually distinguishable, and in none of them does it appear that the jurisdictional question presented here was raised or decided, and the opinions in those cases contain no analysis or reasoning that supports DuPont's legal position.